[No. A072016. First Dist., Div. Four. Aug. 29, 1996.]

SOFTWARE DESIGN AND APPLICATION, LTD., et al., Plaintiffs and Appellants, v.
PRICE WATERHOUSE, LLP, Defendant and Respondent.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of footnote 1 and part II.C.

## COUNSEL

Raifman & Edwards, Jon Logan Edwards and Liesel Brand Stevens for Plaintiffs and Appellants.

Theodore P. Senger for Defendant and Respondent.

## OPINION

**ANDERSON, P. J.**—This is an appeal from a judgment following the granting of Price Waterhouse, LLP's (Price Waterhouse) (respondent) motion for summary adjudication as to causes of action for negligence, negligent misrepresentation and breach of contract.[1] Mand Chatterjee and Software Design and Application, Ltd. (SDA) (collectively appellants) entrusted significant funds to a dishonest financial adviser and, upon the adviser's urging, invested those funds in a company for which he was simultaneously performing investment banking services. Their investment failed, as did the company. Appellants then pursued litigation against respondent, the company's auditor. They have no claim and, accordingly, we affirm the judgment.

---

[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *

*See footnote, *ante,* page 464.

## I. FACTS

SDA is a Hong Kong corporation principally owned and controlled by Manu Chatterjee. In May 1991 Chatterjee retained Patrick McDonald to supervise and manage certain funds of SDA, with McDonald guaranteeing an annual return of 19 percent. Around April or May of the following year, McDonald approached Chatterjee with a suggestion that he consider investing in Embrace System Corporation (Embrace). In that same time frame, appellants transferred $688,509 to McDonald, to be added to funds already under his control, for purposes of investing approximately $1 million in Embrace. McDonald told Chatterjee that the Embrace shares would be registered with the Securities and Exchange Commission (SEC) by July or August 1992 and, if that did not happen, he could privately sell the stock for at least $12.50 per share.

Chatterjee made it clear to McDonald that he wanted "a big six accounting firm to be involved"; he needed "to see some of the documented financials" before he authorized any purchase. He insisted on one of the big six "to give the company credibility and show me some numbers before I put my money." In May 1992 Price Waterhouse was retained by Embrace to audit the company's December 31, 1992, financial statements. Price Waterhouse issued its audit report to the board of directors and shareholders on March 31, 1993.

McDonald purchased 1,551,136 shares of Embrace for $1 million-plus, at a price per share of $0.66, misrepresenting to Chatterjee that he bought 325,000 shares at $3.15 per share. McDonald transferred the 325,000 Embrace shares to Chatterjee and "wrongfully converted" the remaining shares for his own purposes. McDonald was acting as investment banker for Embrace at the time he solicited Chatterjee's investment.[2]

Then, in January 1993, it became apparent there was a $900,000 "cash shortfall" in the SDA account with McDonald. Chatterjee and McDonald agreed that McDonald would transfer 150,000 additional Embrace shares to Chatterjee, his relatives and SDA, to make up the difference. Chatterjee did not know where McDonald obtained these shares or how much he paid for them, if anything.

Chatterjee of course sued McDonald, and in that action declared that McDonald defrauded him of 1,388,550 shares of Embrace stock and

---

[2]*When* Chatterjee learned of McDonald's role is anyone's guess. In his March 1994 declaration in support of his action against McDonald, Chatterjee declared he "only recently discovered" McDonald's role. In the deposition for this action, Chatterjee testified he learned of McDonald's involvement in the management of Embrace in the period April or May 1992.

$685,000 in other investments. Chatterjee also sued several banks and brokerage firms that McDonald had used to set up fictitious accounts to filter SDA's funds for his own purposes.

The gist of appellants' suit against Price Waterhouse is that appellants invested and continued to invest in Embrace in reliance on the auditor's representations and work product, but the auditor's reports contained "numerous, material errors, inaccuracies and false representations regarding the financial condition of Embrace." "In fact, Embrace's assets were overstated" and as of October 1994, its shares were "essentially worthless."

Price Waterhouse demurred to appellants' first complaint, which they then amended with new allegations of an oral contract "that Plaintiffs were third party beneficiaries of the engagement contract" and that Price Waterhouse "provided its services with the intention of influencing specific investors, especially Plaintiffs." Price Waterhouse moved for summary adjudication of the negligence, negligent misrepresentation and breach of contract claims.

Opposing this motion, appellants presented the declaration of McDonald wherein he declared that beginning in late April 1992, he acted as financial and investment banking consultant for Embrace. He informed Price Waterhouse that Embrace was actively engaging in efforts to solicit and reassure potential investors, including appellants, that their seed capital was crucial to the company, and that appellants would rely on the firm's work and representations in deciding whether to invest and continue to invest. In light of these concerns, Price Waterhouse "expressly agreed that all present and potential investors would be third party beneficiaries of the services PW performed for Embrace. This group expressly included Chatterjee and SDA." McDonald also asserted that several statements which Embrace filed with the SEC in June and July 1992 were the "work product" of Price Waterhouse.

The court ruled against appellants, concluding that McDonald's declaration could not alter or amend the terms of the written audit engagement contracts and did not create a reasonable inference that appellants were specifically intended beneficiaries of the audit report. This appeal followed entry of judgment for Price Waterhouse.

## II. Discussion

### A. *Standard for Granting Summary Judgment*

Under recent amendments to our summary judgment statute, a defendant moving for summary judgment meets his or her burden of demonstrating that

a cause of action lacks merit by showing that one or more elements of the cause "cannot be established." With that showing, the burden shifts to plaintiff to set forth specific facts showing the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (o)(2).)

### B. *The Trial Court Correctly Granted Summary Adjudication of the Negligence and Breach of Contract Claims*

Both parties agree that *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745] controls appellants' negligence claim. There, investors in a computer company sued an accounting firm following the "meteoric rise and equally dramatic demise" of the company's fortunes. (*Id.*, at p. 376.) The court identified three concerns that militated against extending liability to foreseeable third party users of audit reports: (1) exposure to liability far out of proportion to fault; (2) the ability of potential investors to use the power of contract to adjust the relevant risks through "private ordering"; and (3) the unlikelihood that the asserted advantages of a rule of liability—namely, more accurate auditing and more efficient loss spreading—would occur. (*Id.*, at pp. 398-406.)

It then concluded that "an auditor's liability for general negligence in the conduct of an audit of its client financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory." (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th at p. 406.) The court went on to point out that an additional class of persons would qualify as the equivalent of a client: "It is possible that the audit engagement contract might expressly identify a particular third party or parties so as to make them express third party beneficiaries of the contract. Third party beneficiaries may under appropriate circumstances possess the rights of parties to the contract." (*Id.,* at p. 406, fn. 16.)

Appellants' negligence claim fails under *Bily* and the parol evidence rule. First, they were not expressly identified, let alone alluded to, in the audit engagement letters signed by Price Waterhouse and acknowledged by Embrace.[3] McDonald, who was not a party to those agreements, cannot change this fact just by declaring that, contrary to the express written terms, Chatterjee and SDA were express third party beneficiaries of the audit engagement contracts.

---

[3]There are two letters: one dated May 11, 1992, committing to examination of the December 31, 1992, financial statements and one dated October 19, 1993, committing to the audit of the December 31, 1993, financial statements.

Second, under the basic tenets of the parol evidence rule, McDonald's declaration cannot alter the contractual terms. ■■ The terms of a writing which the parties intend as a final expression of their agreement cannot be contradicted by evidence of a prior agreement or contemporaneous oral agreement. (Code Civ. Proc., § 1856, subd. (a).) It is up to the court to determine whether the writing is an integration so as to preclude resort to contradictory, collateral oral agreements. (*Id.*, subd. (d).) If it is deemed integrated, extrinsic evidence is admissible only where relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Banco Do Brasil, S.A.* v. *Latian, Inc.* (1991) 234 Cal.App.3d 973, 1001 [285 Cal.Rptr. 870].)

Faced with deciding whether the parties intended a written instrument to be the exclusive repository of their agreement, courts may consider all the surrounding circumstances, including prior negotiations, and may examine the collateral agreement itself to ascertain if it was meant to be part of the bargain. (*Masterson* v. *Sine* (1968) 68 Cal.2d 222, 226 [65 Cal.Rptr. 545, 436 P.2d 561]; *Banco Do Brasil, S.A.* v. *Latian, Inc., supra*, 234 Cal.App.3d at p. 1002.) However, the collateral agreement will be looked to only insofar as it does not directly contradict the express terms of the writing. Further, it must be an agreement which, in the normal course of events, might be made as a separate contract. Spun somewhat differently, are the parol terms such that, if agreed upon, they most certainly would have been included in the writing? (*Masterson* v. *Sine, supra*, 68 Cal.2d at pp. 227-228; *Banco Do Brasil, S.A.* v. *Latian, Inc., supra*, 234 Cal.App.3d at p. 1002.)

■■ Here, although there is no "integration" clause in the engagement letters, they are nonetheless complete. First, the written letter contracts are plain on their face concerning the scope of work undertaken, as well as the fee structure for the services of Price Waterhouse; there is no mention of any third party beneficiaries or any investors or potential investors, period. Neither Chatterjee, SDA nor McDonald is referred to in the letters and none are signatories. The Price Waterhouse partner for the audit attested that he had no contact with or awareness of Chatterjee or SDA, and Chatterjee himself could not recall ever speaking with anyone from Price Waterhouse, sending any writing to the firm, or receiving anything directly from Price Waterhouse.

There simply is no ambiguity as to who the parties are, or who the client of the accounting firm is. (This is unlike the situation in *Maulhardt* v. *Cal. Director Public Works* (1959) 168 Cal.App.2d 723, 734-735 [336 P.2d 631], cited by appellants, wherein the contract was unclear as to whether the

contracting party was acting on behalf of a joint venture or was obligating himself alone. This is also unlike *Pistone* v. *Superior Court* (1991) 228 Cal.App.3d 672, 680-681 [279 Cal.Rptr. 173], stating an exception to the parol evidence rule for extrinsic evidence of an undisclosed principal or party in interest.)

Second, the alleged oral agreement is not one that might naturally have been made as a separate agreement between parties similarly situated. Indeed, it is highly incompatible with the transaction that was memorialized. To begin with, the engagement letters set forth a discounted rate for services rendered, between one-third and one-half the standard billing rate of Price Waterhouse for the first year, and with a 20 percent discount for the second. This reduced fee schedule is totally at odds with the notion that Price Waterhouse further intended and agreed that Chatterjee, SDA and *all* present and potential investors would be third party beneficiaries of the services it performed for Embrace. Such an undertaking, with the attendant additional and vast potential liability, simply would not be the subject of an oral agreement, attested to only by one not a party to the written contract. Moreover, were investors truly to be third party beneficiaries, it is inconceivable that they would not insist on written confirmation of this undertaking by the accounting firm.

For these reasons we conclude the engagement letters were integrated agreements and the trial court properly declined to consider the revisionist, contradictory terms alleged in McDonald's declaration. This being the sole evidence of appellants' claim as third party beneficiaries, the court properly granted summary adjudication on the negligence cause of action. Their breach of contract claim also falls because they were not parties to, or third party beneficiaries of, the audit engagement contracts with Embrace.

C.   *Summary Adjudication Was Proper on the Negligent Misrepresentation Claim\**

. . . . . . . . . . . . . . . . . . . . . . . . .

For all these reasons, we affirm the judgment.

Poché, J., and Hanlon, J., concurred.

---

*See footnote, *ante*, page 464.